# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

ADIB EDDIE RAMEZ MAKDESSI,     )
     Plaintiff,             )
                        )      Civil Action No. 7:15cv00130
v.                     )
                        )     <u>REPORT AND RECOMMENDATION</u>
HAROLD CLARKE, et al.,       )   By: Hon. Pamela Meade Sargent
                        )     United States Magistrate Judge
     Defendants.        )

     The pro se plaintiff, Adib Eddie Ramez Makdessi, a Virginia Department of Corrections, ("VDOC"), inmate housed at Red Onion State Prison, ("Red Onion"), in Pound, Virginia, filed this action for monetary damages and injunctive relief under 42 U.S.C. § 1983 alleging that various VDOC employees are retaliating against him for filing lawsuits against various VDOC employees. This matter is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). Evidentiary hearings were held in this matter on June 30 and August 26-28, 2015. The undersigned now submits the following report recommending that the plaintiff's claims be denied.

## I. Facts

     In his original pleading, (Docket Item Nos. 1, 2), Makdessi sought injunctive relief ordering that he be transferred to protective custody at Dillwyn Correctional Center, ("Dillwyn"). In this pleading, filed with the court on March 20, 2015, Makdessi alleged that he was assaulted by three VDOC employees upon his arrival

Case 7:15-cv-00130-GEC-PMS   Document 120   Filed 12/17/15   Page 1 of 70   Pageid#: 827

at Red Onion on March 17, 2015,[1] in retaliation for prevailing in an appeal in a previously filed lawsuit against officers at Wallens Ridge State Prison, ("Wallens Ridge"). In particular, Makdessi alleged that three unidentified correctional officers "jumped" on him and forced his arms to the back to be handcuffed despite his informing them that he had a "front cuff order" from a doctor. Makdessi alleged that the officers "attacked" him using "extreme force" while he loudly yelled "I am in pain. I am in pain." He alleged that the officers pushed him into the wall, hitting his head hard against the wall. Makdessi alleged that he was seen by a nurse, who "covered-up everything" and refused him any treatment or medication.

In this pleading, Makdessi further alleged that, when he requested Emergency Grievance and Complaint forms from Red Onion Unit Manager Tori Raiford, Raiford threatened him and told him that he would not receive any forms. Makdessi also alleged that three unnamed officers, "Lt. & Sgt. and another officer," threatened to harm him if he did not forget about his lawsuits or if he attempted to file any Complaints or Grievances while at Red Onion.

In his § 1983 Complaint, (Docket Item No. 12), Makdessi alleged violations of his rights under the First, Sixth, Eighth and Fourteenth amendments to the U.S. Constitution based on retaliation, assaults and deliberate indifference by various VDOC employees. In particular, Makdessi alleged that he injured his back and shoulder on January 8, 2015, when Major Mullin, Sgt. Jones and Unit Managers Doss and McBride at River North Correctional Center, ("River North"), refused to give him a cart to carry his property as he moved from one building to another

---

[1] Makdessi's original pleading alleged that this occurred on March 16, 2015, but in a subsequent filing he stated that he was mistaken and that it occurred on March 17, 2015. (Docket Item No. 2-1).

despite his protests that his medical conditions would cause him to "get reinjured." Makdessi further alleged that, after exhausting his administrative remedies as to this incident, he was threatened by Mullin and McBride "that they are sick and tired of me filing complaints and law suits and sick of me teaching [protective custody] inmates about due process." He further stated that they told him that the VDOC was going to send the protective custody pod inmates to Red Onion where Major Gallihar, a defendant in another of Makdessi's lawsuits, would teach him to stop filing actions and Grievances.

In his § 1983 Complaint, Makdessi further alleged that, within the first 10 minutes after his arrival at Red Onion on March 17, 2015, he was "severely assaulted by [the use of] extreme excessive force to cuff me to the back by smashing my head to the wall" by three unnamed officers. Makdessi alleged that he showed the officers a "front cuff order" that he carried in his pocket at all times. He said that he told the officers that he could not place his hands to the back because of an "ongoing injury" to his shoulder. Makdessi alleged that the officers told him that they did not care and had been waiting for him to arrive. According to Makdessi the officers said, "We know who you are. Major Gallihar sends his regards." Then the officers "jumped" on him, grabbed his arms and "used extreme excessive force and forced my arms to the back" as he screamed very loudly in pain. Makdessi also alleged that the officers "smashed" his head into the wall with "very extreme excessive force" causing it to bleed.

Makdessi alleged that the Regional Administrator of VDOC was present and ran over to determine why he was crying so loudly. Makdessi said that the Regional Administrator told the officers to remove the handcuffs and cuff him to the front. Makdessi alleged that the officers then "dragged" him to the D-1 pod

while he was in extreme pain from his shoulders, head and back, with pain going down his legs and "dizzy from the injury to [his] head." Upon entering the D-1 pod, according to Makdessi, Lt. G. Adams got in his face and "head butted" him while unnamed officers were holding and twisting his arms and shoulders, causing him extreme pain. Makdessi alleged that, while Unit Manager Raiford watched, Lt. Adams threatened to kill him if he ever complained, asked for Grievance forms or filed a Grievance. Makdessi alleged that, when the intake nurse looked at him, he was not allowed to complain about his injuries and, instead, was "dragged away" after telling her his shoulder had been injured.

Makdessi further alleged that Major Gallihar and Lt. Adams threatened to place him in a cell with a "gangster who will f-me-up and kill me just like what had happened at Wallens Ridge…." Makdessi also alleged that an unnamed person threatened to set him up with a weapon so that he could be placed in segregation if he did not dismiss his lawsuits or if he continued to file grievances. Makdessi alleged that on April 9, 2015, Lt. Adams came to him in the chow hall in front of three other witnesses and said: "By the way, I want to let you know, that my great, great, Grand dad[d]y was Hitler, and I am so proud of him, how he barbecued Jews like you." Makdessi also alleged that on April 14, 2015, after telling a counselor that he needed copies made for a filing in federal court, unnamed officers came to his cell and took his eyeglasses. Makdessi claimed that he told them he could not read and write without his glasses, and they responded, "We know. That's the idea." He said that Gallihar then came by his cell and told him that he now could not write his lawsuits or Grievances and laughed. Makdessi stated that officers later tried to force him to sign a confiscation form saying that his glasses were cracked, but he refused to do so.

In a June 8, 2015, filing, Makdessi alleged that he was being denied single-cell status in retaliation for filing lawsuits. (Docket Item No. 23.) In particular, he alleged that, on June 1, 2015, Raiford came to his cell and threatened to prevent a psychiatrist from seeing him. Makdessi alleged that Raiford threatened to remove his then-current cellmate and replace him with someone who would assault him. Makdessi attached a copy of an Inmate Request For Information/Service form he alleged that he sent to the Warden on June 3, 2015, complaining of being denied single-cell status and psychological treatment. (Docket Item No. 23-1.)

On June 17, 2015, Makdessi filed a motion requesting to be removed from a western Virginia prison. (Docket Item No. 24.) In this document, Makdessi alleged that he had lost 45 pounds "due to being poisoned" on April 23, 2015, by "the defendants" and due to severe depression and psychological problems. Makdessi again alleged that he was being denied psychological treatment. Makdessi also alleged that "the named defendants at Red Onion" had placed an inmate on his enemy list in the cell with him. Makdessi stated that he had filed sexual harassment charges against this inmate, whom he referred to as "Rabit," on April 4, 2014, when they both were housed at River North. Makdessi stated that, when he informed the "named defendants at Red Onion" that Rabit was on his enemy list and could not be placed in his cell, they said "we know about that." He alleged they said they were going to teach Makdessi a lesson, saying, "[W]e did not [break] you at Wallens Ridge, but I [promise] you this, we will [break] you and teach you in this Red Onion Prison." Makdessi alleged that the defendants attempted to force him to sign a waiver to allow the inmate to be placed in the cell with him, but he refused to do so.

Makdessi attached a copy of a request he alleged that he sent to Dr. McDuffy, a psychiatrist, the Warden, Raiford, Gallihar and Adams on May 29, 2015, requesting single-cell status. (Docket Item No. 24-1.) Also attached to this filing was a response to Makdessi's June 3, 2015, Inmate Request For Information/Service form, stating that his requests had been forwarded to Mental Health. (Docket Item No. 24-1.)

An evidentiary hearing was held before the undersigned on Makdessi's requests for preliminary injunctive relief on June 30, 2015. At this hearing, Makdessi testified that, at that time, the only relief he was seeking was an injunction ordering the VDOC to transfer him to the protective custody unit at Dillwyn and to give him single-cell status. At this hearing, Makdessi testified that he believed that a Fourth Circuit Court of Appeals ruling in his favor in another of his lawsuits justified him being given single-cell status. He said that he had hand-delivered a request for single-cell status based on this ruling to Red Onion Warden Barksdale on June 11, 2015. (Plaintiff's Exhibit No. 1, (Docket Item No. 29-1)).

Makdessi stated that he needed to be housed in a single cell for a number of reasons, including his Middle Eastern ethnicity, his physical disabilities – shoulder and back problems, and his small, short stature. He testified that his cellmates always take advantage of him by eating his commissary items. Makdessi testified that he is too scared to complain about his cellmates' actions, and he was too small to defend himself. Makdessi stated that he wanted single-cell status because he would be able to sleep better and would be less paranoid. He said that he often talked in his sleep and that this would irritate his cellmates. He said that if he was given single-cell status, he would be less scared of being beaten up.

–6–

Makdessi testified that when he first arrived at Red Onion, he was placed in a cell with Inmate J. Sandberg. He stated that he was housed with Sandberg approximately one month, but Sandberg had surgery and was removed from the cell with Makdessi. Makdessi admitted that no harm came to him while he was housed with Sandberg.

Makdessi stated that an inmate named "Rabit" Cobler was then placed in the cell with him for 15 days. He stated that Cobler was removed from the cell on June 26, 2015, after Makdessi had complained to the court that Cobler was on his enemy list. Makdessi testified that he had filed sexual harassment charges against Cobler when they both were housed at River North before they were transferred to Red Onion. At the June 30 hearing, Makdessi testified that, while they were cellmates at Red Onion, Cobler had never physically harmed him. He also testified that Cobler had never made any direct threats toward him while they were cellmates. He stated that Cobler did not assault him in any way. Makdessi said that he kept Cobler "on his good side" by allowing him to eat and drink his commissary items.

Makdessi said that Cobler would sometimes say things of a sexual nature, perhaps jokingly. However, Makdessi said that he interpreted these statement very differently due to his past history of sexual assaults. Makdessi said that Cobler would walk around in the cell in only shorts with his "thing" hanging out, and that would bother Makdessi. "Psychologically, I cannot take it," he said. Makdessi said that the only comment of a sexual nature that Cobler made toward him while they were cellmates is that Cobler told him that he could clean his behind by sticking soap in his rectum. Makdessi said that he told Cobler that he did not want to hear statements like that, and he claimed that he had a "psychological episode" as a

result of the statement. Makdessi testified that he did not report this statement because, if he did, he was afraid that both he and Cobler would end up in segregation, and he would be labeled a "snitch."

Makdessi testified that he was 52 years old "with a lot of physical problems." Makdessi admitted that he had never been required to use a wheelchair, but he stated that he moved with a lot of pain from his back into his legs. He stated that he also had problems with his left shoulder. He admitted that he could feed himself and needed no assistance to use the toilet.

When Makdessi appeared in court on June 30, he claimed that he would throw up every time he ate prison food because he was being poisoned. He said that if he ate the food that his sister sent him, he would not be sick. Makdessi testified that he had lost about 45-50 pounds in the previous two months. Makdessi admitted, however, that he had not filed a request form to be seen by Medical for being poisoned. Makdessi testified that on June 26, 2015, Cobler was present when Officer White told Makdessi that he was one of the ones who was poisoning his food. Makdessi said that later that same day, around 3:15, White told him, "I wish Hitler had murdered all of your Jewish sand nigger families so you would not be born."

Makdessi testified that White made numerous racist comments to inmates, but he was afraid to report half of the "stuff" he witnessed at Red Onion. Makdessi also claimed that he had listed four or five inmates on his enemy list. He said that he had been told that only one inmate – Smith, the cellmate who had assaulted him at Wallens Ridge, was actually included on his enemy list.

Makdessi testified that he was strip searched on April 23, 2015, after a drug dog alerted on his cell. Makdessi said that White was present when he was strip searched and said, "How did you like that big dick up your ass? Major Gallihar wants to know." Makdessi said that he was stripped naked in front of all the inmates in the pod. He also said that all of his legal documents were torn up.

Makdessi further testified that, while at Red Onion, he had filed more than 50 Complaints and had never received a receipt for any of them. Makdessi stated that whenever he asked Unit Manager Raiford for a Complaint form she would tell him/, "Shut the f--- up!" He said that Raiford refused to give anyone an Informal Complaint or Grievance form. Makdessi stated that Raiford, White and Lt. Adams had all threatened that they would hurt him if he filed any Complaints. Makdessi stated that his original cellmate at Red Onion, Sandberg, gave him three Complaint forms that he had brought with him to Red Onion. Makdessi said that he had purchased 4 Informal Complaint forms from another inmate for two packs of crackers.

Inmate Charles V. Cobler also testified at the June 30 hearing. Cobler testified that he was 50 years old and 5 foot 9 or 10 inches tall. Cobler denied that he had ever threatened Makdessi. To the contrary, he said that Makdessi had tried to get him to lie for him. Cobler said that Makdessi told him that, if he would help Makdessi get Raiford and Gallihar, he would pay Cobler a lump sum of money after he got a settlement in his lawsuits. Cobler said that Makdessi wanted him to say that he was being poisoned. Cobler testified that Makdessi said about Raiford, "I'm going to get that bitch if it is the last thing I do." Cobler said that Makdessi said he was going to get Gallihar, too. Cobler said that Makdessi wanted him to testify that Raiford was harassing him, but he said he refused because it was not

true. He said, "Raiford was as nice as she could be." Cobler said that Makdessi tried to get him to write untrue affidavits against Raiford and Gallihar. Cobler said that he got tired of hearing about Makdessi's court cases, and he told Makdessi that he was not going to get involved in them. Cobler said that he was moved out of the cell with Makdessi after he told prison officials that Makdessi was trying to convince him to lie for him. He said that he asked to be moved from Makdessi's cell.

Cobler admitted that he did eat peanut butter and tuna fish off of Makdessi's Common Fare tray because Makdessi would give it to him. Cobler said that he never got sick when he ate from Makdessi's tray. Cobler did admit that he had seen Makdessi throw up while they were in the same cell. Cobler said that every night when he turned off his television to go to sleep, Makdessi would start coughing and get up and walk to the toilet and flush the toilet. Cobler said that he thought Makdessi did this intentionally to attempt to agitate him. Cobler said that Makdessi did snore at night, but he had never heard him scream out in his sleep.

Cobler specifically denied that he had ever sexually harassed Makdessi while they were housed at River North. Cobler admitted that he once told another inmate nicknamed Peatown, "Fuck you" in front of Makdessi. He said the comment was not directed at Makdessi.

Red Onion Unit Manager Tori Raiford also testified at the June 30 hearing. Raiford testified that she had moved Cobler out of the cell with Makdessi after Cobler had told officers that Makdessi had asked him to lie for him. She said the move had nothing to do with Cobler causing Makdessi any problems.

Raiford testified that she could not recall going to Makdessi's cell on March 17, 2015. She said that a K-9 officer with a dog was present at Red Onion on that day, but she did not recall ever being at Makdessi's cell door with the K-9 officer. She also said she did not recall ever telling Makdessi "sit the fuck on your bed. I don't want to hear from you." Raiford said that she did recall being present at a pod table when Makdessi and Gallihar had a conversation. She said that she could not recall what the conversation was about because her recollection was that she was just there as a witness for Gallihar.

Raiford also said that she could not recall Makdessi ever asking her for psychological or psychiatric treatment. Raiford denied that she had ever instructed a mental health worker not to treat Makdessi. She also denied ever taunting or harassing Makdessi. Raiford testified that she had not seen the Inmate Request For Information/Service form Makdessi filed as Enclosure B to one of his requests for injunctive relief until he filed it with the court. (Docket Item No. 24-1.)

Raiford admitted that, as Unit Manager, she had the ability to place Makdessi in a single cell. She stated that the criteria for single-cell placement included the inmate's medical and psychological conditions. Raiford said that she had spoken with both the Medical and Mental Health Departments at Red Onion, and she had no information that would qualify Makdessi for single-cell status. Raiford gave examples of a deaf inmate and another inmate who was confined to a wheelchair being given single-cell status. With regard to mental health conditions that might qualify an inmate for single-cell status, she listed schizophrenia.

Raiford acknowledged that Makdessi has an "alert reference card" on his cell door at Red Onion, but she said that did not mean that he qualified for single-cell status.

Raiford stated that Makdessi had never requested administrative remedy forms from her and, therefore, she had never refused to give him such forms. Raiford stated that such forms were available from any correctional officer or supervisor. She stated that the forms were kept in each building, and, to her knowledge, no inmate was ever denied a form. She said that she knew that she had seen two or three Grievance forms that had been filed between March and June by inmates housed in the in the same building with Makdessi. Raiford stated that she could not recall ever receiving any request forms from Makdessi. She conceded that on one occasion Makdessi told her that he had given a form directed to her attention to a sergeant. She also admitted that she told Makdessi that she "looked forward to receiving it."

Vicky Phipps, the Director of Nursing at Red Onion, also testified at the June 30 hearing. Phipps stated that she had reviewed Makdessi's VDOC medical records and that the records did not contain any evidence that he was "particularly vulnerable." Phipps said that she did not consider someone with severe arthritis in a shoulder to be disabled. Phipps said that there was nothing in Makdessi's medical records that would prevent him from having a cellmate. She stated that his shoulder and back condition, however, did justify him having a bottom tier cell and the bottom bunk in a cell. Phipps conceded that the medical records showed that Makdessi had lost 24 pounds since arriving at Red Onion. She said that his weight upon arrival was 210 pounds, and his weight on June 23, 2015, was 186 pounds.

She stated that the medical records did not contain any mention of Makdessi ever requesting medical treatment for food poisoning.

Phipps testified that approximately 30 protective custody inmates, including Makdessi, arrived at Red Onion on the same day. Phipps said that, upon intake, a nurse examined each inmate for signs of abuse or trauma. Phipps stated that she examined Makdessi upon his intake at Red Onion, and she did not see any blood on him and no signs or symptoms of abuse or trauma. She stated that, if she had seen blood or a knot on Makdessi's head, she would have documented it.

Phipps conceded that the medical reports from River North contained a physician's note to cuff Makdessi in front, but she stated that this was not considered a valid doctor's order because it had no period of time listed. She stated that doctors were not allowed to write indefinite time period orders for VDOC inmates. Phipps stated that, once Makdessi arrived at Red Onion, a nurse entered a front cuff order for him until he could be seen by a doctor. Phipps stated that Makdessi did not have a front cuff order entered into the VDOC's CORIS computer system until she had her secretary entered the order in the system after Makdessi's arrival at Red Onion. Phipps stated that even though inmates' medical records are transferred with them between VDOC facilities, the security personnel would not see these records. Phipps said that these records are transferred in sealed envelopes that are opened after an inmate's arrival by medical personnel.

Phipps confirmed that Makdessi's eyeglasses had been confiscated by security personnel at Red Onion. She said Makdessi and several other inmates were waiting to be seen by an optometrist. Phipps stating that seeing an optometrist

had been delayed for these inmates because there was a period of time when Red Onion did not have an optometrist under contract to provide services.

Terrence Huff, Psychology Associate II and a mental health supervisor, also testified at the June 30 hearing. Huff said that Unit Manager Raiford had never instructed mental health workers to deny services to Makdessi. Huff stated that he completed the initial mental health assessment on Makdessi upon his arrival at Red Onion, and he has participated in Makdessi's ongoing mental health treatment. He said that Makdessi claims to suffer from post-traumatic stress disorder, but he has never been formally diagnosed with post-traumatic stress disorder. Huff said that Makdessi also claims to be anxious, depressed and to disassociate and suffer from nightmares and flashbacks.

Huff stated that, at his initial mental health assessment, Makdessi told him he was assaulted by officers when he got off the bus at Red Onion. Huff said that he did not see any visible injuries, red marks or blood on Makdessi, even though he spoke with Makdessi for 20 to 25 minutes. He said that Makdessi said that he had a pending lawsuit against Gallihar and was not supposed to be housed at Red Onion. Huff said Makdessi told him, "I'm not like other inmates. I settle my disputes through court."

Huff stated that Makdessi was obviously very intelligent and well-spoken. He said that Makdessi appeared normal and in stable condition. Huff stated that Makdessi's behavior was incongruent with his voiced complaints. Huff described Makdessi as exhibiting "Cluster B traits" with an anti-social and narcissistic personality disorder. Huff stated that Makdessi is very self-centered with feelings of self-importance and a high sense of entitlement. Huff stated that the initial

mental health assessment attempts to determine if an inmate is vulnerable due to factors like intellectual challenges or delusions. He said that he observed neither in Makdessi. He stated that Makdessi had never displayed any symptoms that would justify a single-cell placement. In particular, Huff stated that Makdessi was not in any acute distress, and he was able to perform normal daily activities. He stated that he had never recommended that Makdessi be placed in a single cell.

Huff testified that he was aware that Makdessi had alleged that he had been raped by another inmate in either late 2010 or early 2011. He said that Makdessi had been charged with fighting, and Makdessi claimed that the other inmate had requested oral sex. Makdessi said that he had punched the other inmate in the groin, and the inmate then sexually assaulted him. Huff stated that Makdessi was medically examined for a sexual assault, but no evidence was found to substantiate his claim.

Huff stated that Qualified Mental Health Professionals, ("QMHPs"), would see an inmate housed in general population only if the inmate requested mental health services. He said that inmates housed in the protective custody unit were considered to be housed in general population. Huff stated that Makdessi had been designated as at high risk for sexual victimization. Huff stated that Makdessi had been so designated because of his statements that he felt threatened. Huff said that an inmate also could be designated as at high risk for sexual victimization if he were of small stature. Huff said that this designation was made to ensure that the designated inmate was not placed in a cell with a sexually aggressive inmate.

Because of this designation, Huff stated that Mental Health would see Makdessi every six months, or more frequently, if requested. Huff stated that he

had told Makdessi he had been so designated and to let him know if he needed to see Mental Health. Huff stated that Makdessi had been seen by QMHP Adams on two or three occasions since arriving at Red Onion. Huff said that Adams had noted that Makdessi suffered from narcissistic traits and fictitious symptoms for secondary gain. Huff stated that he had not seen Makdessi since the day that he arrived at Red Onion. Huff stated that he and QMHP Adams had discussed Makdessi's case with regard to whether to refer Makdessi to see a psychiatrist. He stated that, up until that time, Makdessi had not been referred to a psychiatrist because Makdessi had said he did not want to take mental health medication. Huff stated that, if he had thought that Makdessi lacked the mental capacity to make a decision about his medication, he would have referred him to a psychiatrist. However, Huff said that he had no indication that Makdessi suffered from any ongoing mental illness that needed to be treated with medication.

Chelsey Adams, a Psychology Associate I at Red Onion, also testified at the June 30 hearing. Adams stated that she had listened to Huff testify and agreed with his testimony. She stated that she had seen Makdessi for mental health treatment twice since he arrived at Red Onion. She stated that she had never denied Makdessi mental health treatment. She stated that, on both occasions, Makdessi asked her to be seen by a psychiatrist in order to obtain single-cell placement. She said that she had not referred Makdessi to be seen by a psychiatrist because Makdessi had told her that he did not want to take psychotropic medication. Adams stated that, in her opinion, Makdessi did not need to be seen by a psychiatrist. Adams stated that she did not recall Makdessi asking her to be referred to a psychiatrist on June 11, 2015, to discuss "non-mind-altering" medication. She said that she did recall Makdessi telling her he was paranoid because Cobler had been placed in a cell with him, but

she denied that Makdessi had ever told her that he had accused Cobler of sexual harassment at River North.

On July 15, 2015, Makdessi filed a motion for an emergency protection order. (Docket Item No. 35.) In this motion, Makdessi alleged that an unnamed K-9 officer, along with other unnamed officers, threatened him and ordered him to return to his cell without breakfast on July 10, 2015. Makdessi alleged that the K-9 officer said, "if we don't poison your ass, we will starve your ass ha ha ha, we told you to drop your law suits." Makdessi alleged that he returned to the pod and requested an Emergency Grievance and Complaint form from an unnamed officer, and he refused to give him the forms.

In this motion, Makdessi also alleged that Red Onion Assistant Warden Hamilton came to his cell door on July 9, 2015, and told him that he would never be placed on single-cell status and that all of his Complaints and Grievances were being thrown in the trash. Makdessi also alleged that his recreation was taken from him on July 10, 2015, by Officer White because Makdessi could not get out of bed fast enough for count. Makdessi alleged that White told him, "get the f--k out of bed fast you f---ing sand niger…. I don't give a f--k about your medical problems, you are punished, don't get out all day for pod recreation."

Makdessi also alleged that unnamed Red Onion prison officials were telling inmates in the protective custody pod that he was a snitch and that he was the reason the entire protective custody pod was transferred from River North to Red Onion. He also alleged that these officials were encouraging Makdessi's fellow inmates to threaten, harass and assault him and take his food and commissary items. Makdessi said that Inmate Cobler was allowed out of his cell on the top tier

–17–

of the pod to come to Makdessi's cell on July 8, 2015, to threaten and harass him. Makdessi alleged that Cobler told him that the officials were destroying his grievances and complaints. He claimed that Cobler also told him that "he will [tear] my ass up and will make me suck his dick" if Makdessi did not drop his lawsuit. Makdessi alleged that Cobler told him that if he filed any more complaints he would kill him. Makdessi also alleged that unnamed officers were laughing at Cobler's threats and that they threatened to plant a weapon on him if he complained.

An evidentiary hearing was held on Makdessi's claims on August 26-28, 2015. At this hearing Makdessi testified that he had been assaulted, harassed and threatened by various VDOC employees and inmates because he had filed a lawsuit against Major Gallihar and others based on a sexual assault by his cellmate while housed at Wallens Ridge.

Makdessi testified that he was transferred, along with others in the protective custody unit at River North, to Red Onion on March 17, 2015. Makdessi said that when he arrived at Red Onion, he stepped off of the bus and gave his name and inmate number to a correctional officer who had a roster sheet of those inmates being transferred. Makdessi claimed that he saw that his name was highlighted on the roster sheet with a notation to cuff in front. Makdessi stated that after changing clothes, he was taken into a hallway and told to put his hands behind his back to be cuffed. Makdessi said that he reached into a pocket on the front of his shirt to remove a copy of a "front cuff order" to give the officers. Plaintiff's Exhibit No. 34 (Docket Item No. 92-28), is the order that Makdessi stated that he was carrying in his pocket when he arrived at Red Onion.

Makdessi testified that three unnamed officers "jumped" on him, forcing his arms to the back and hitting his head on a nearby wall and knocking his eyeglasses off his face. Makdessi said that he yelled out in pain and told the officers that he had a doctor's order to be cuffed in front. Makdessi said that G. Baker was present and yelled, "We don't care, put your hands to your back." Makdessi testified that two of the officers who forced his arms to the back -- D. Cornett and J. Fleming -- told him in unison, "We know who you are. You are trouble. We have been waiting for you." Makdessi stated that the Regional Director of VDOC was present and stepped in and ordered the officers to remove the handcuffs and cuff his hands in front. He testified that Baker said, "Makdessi are you still causing trouble?" Makdessi said that Cornett and Fleming then "dragged" him to the D Building saying, "We know you are a big time paper pusher. We have been waiting for you. You file lawsuits." He said the officers twisted his shoulders as they accompanied him to the other building. He said he was dizzy from the blow to his head.

Makdessi testified that, as he entered the building, Lt. Adams started yelling at him and butted him with his head. He said that Mullins told him, "This is the troublemaker who files lawsuits." He said that Lt. Adams told him, "We know who you are. This is Red Onion State Prison. Your will not file complaints. You will not get complaints. I will shoot you in the face." He said that Major Mullins was present and smiling at him as Lt. Adams said this. Makdessi said that Adams told him, "You will be seen by a nurse, but you will not complain. I will f--- you up. I will kill you. I will shoot you in the face if you ever ask for complaints."

While a video recording of Makdessi's intake at Red Onion was admitted into evidence as Plaintiff's Exhibit No. 1, Makdessi said that the video did not show Lt. Adams's threats because they occurred while not in sight of the

surveillance cameras. Otherwise, the video recording, itself, neither supports nor refutes Makdessi's claims with regard to the events of March 17, 2015. In fact, none of the video recordings submitted into evidence prove or disprove Makdessi's claims, except that a video recording of the D-1 pod taken on July 8, 2015, clearly refutes Makdessi's testimony as noted below.

Makdessi testified that, once in the pod, he saw two nurses who weighed him and took his blood pressure. He said that he told both nurses, whose names he could not remember, that he was in a lot of pain, and he asked if he could get his medication. He said that he asked to see a doctor, and the nurses told him that he would see a doctor in a week or two. He said that he told the nurses he wanted to see a doctor then because he was in so much pain. He said that he was too afraid to complain that he had been assaulted because of Lt. Adams's earlier threats.

Makdessi admits that the video recording of his intake shows that he also spoke to a mental health professional that day. Makdessi testified that he also told the mental health professional that he had been injured by the officers that day.

Makdessi testified that, about 30 minutes after being placed in his cell on March 17, Unit Manager Raiford came to his cell. Makdessi said that he told Raiford that he was in a lot of pain, he had blood in his hair, and he asked her for an Emergency Grievance form and an Informal Complaint form. Makdessi said that a K-9 officer with a dog was standing behind Raiford. Makdessi said that Raiford told him, "You will not ask for forms. You will sit the f--- on the bed." Makdessi said that he followed her orders to sit down on his bed because, although he was in his cell, behind a closed cell door, he was scared of the dog.

–20–

Makdessi testified that 10 to 15 minutes later, he was pulled out of his cell by Officer White and taken to a table in the pod where Lt. Adams was sitting with Raiford standing behind him. He said Sgt. Meade was present, also. Makdessi testified that Lt. Adams got in his face and said, "You don't complain. You don't ask for complaints. I will f--- you up. I will kill you. I know you are the troublemaker who files paper. Why don't you sign out of [protective custody] you piece of shit. Go ahead. You want to hit me." Makdessi said he replied, "Sir, I do my fighting with pen and paper." Makdessi said that Lt. Adams told him, "I know you are a big time paper pusher. Go ahead and hit me. Gallihar is nothing compared to me. I will f--- you up. I will rip it up if you ever file a complaint. This is Red Onion. You don't file complaints. You don't file lawsuits. I will kill you." Makdessi said that he told Lt. Adams that the only time he filed Complaints was when prison officials "crossed the line." Makdessi said that Lt. Adams told him, "I know you are in here for double murder. I saw it on tv." He said White also said he saw an account of Makdessi's offense on television. Makdessi said he told them he was innocent of the charges. He said that Raiford, White and Meade all should have heard the statement made by Lt. Adams to him on that day.

Makdessi said that while Lt. Adams was yelling and trying to make him get upset, he spoke calmly to Lt. Adams, trying to calm him down. He said that Lt. Adams told him, "Get the hell off the table." He then told White, "Take that piece of shit back to the cell."

Makdessi said that Lt. Adams came back to his cell a couple of hours later and his cellmate, J. Sandberg, tried to ask for an Emergency Grievance or Informal Complaint form. Makdessi said that Lt. Adams told Sandberg, "F--- you." Makdessi said that every time he asked Lt. Adams for a form, he would reply, "F--

- you." Makdessi also testified that Lt. Adams also told him that day, "You are not leaving Red Onion State Prison. You are going to die in here. We will plant drugs or a weapon on you."

Makdessi testified that he experienced severe pain as his arms were forced to the back on March 17. As a result, Makdessi said that he now holds his left arm in a guarded position at all times. Makdessi said that he did not realize his head was injured until he looked in the mirror and saw blood in his hair after he was placed in a cell that day.

Makdessi said that on March 26, 2015, he sat down with Gallihar and Raiford at a table in the D-1 pod to discuss his request to be placed in a single cell. Makdessi said that he complained to Gallihar about Raiford yelling at him and refusing to provide him with the forms he requested. He said that he believed that he also told Gallihar about Lt. Adams's behavior on the date of his intake at Red Onion. He said that Gallihar told him that he would never get single-cell status. He said that Gallihar told him that he would remove his cellmate and place another person in the cell with him. Makdessi said that when he mentioned that the Fourth Circuit Court of Appeals had issued a ruling in his favor, Gallihar got angry and said, "Get off my table and go back to your cell."

Makdessi testified that he saw a doctor on April 2, 2015, and the doctor renewed his front cuff order and his medication.

Makdessi testified that, on April 9, 2015, at around 3 p.m., while he was in the chow hall eating his Common Fare tray, Lt. Adams came up to him and said, "My great, great grand daddy was Hitler. I am so proud of how he killed Jews like

–22–

you." Makdessi said that Lt. Adams then walked away. Makdessi also testified that on April 18, 2015, at 12:30 p.m., Lt. Adams came up to him in the chow hall and demanded that he drop this lawsuit. He said that Lt. Adams told him, "If you drop all lawsuits we will go ahead and be friends." The next morning, on his way to the chow hall for breakfast, Makdessi said that he saw a big picture of Hitler on the wall of Lt. Adams's office. Makdessi testified that on April 23, 2015, Lt. Adams looked at him and smiled and said, "Heil, Hitler."

Makdessi testified that, later that same day, approximately 50 officers with dogs came into the pod. He said they lined up all the inmates in the middle of the pod and then pulled him out and told him to go to the shower to be strip searched. He said that Lt. Adams said, "This is what will happen to you if you file lawsuits." He said the officers told him to strip naked and then took the curtain off of the shower stall so that he could be seen by everyone in the pod. He said that Lt. Adams showed him a bag of drugs that he said was found in Makdessi's cell. He said that Lt. Adams said, "If you drop all lawsuits, we will forget about this. Remember we can make you a level 6 [security level] at any time. We will plant drugs on you. We will plant weapons on you." He said that Officer White walked up and asked him, "How would you like a big penis up your rearend?"

Makdessi testified that the officers who searched his cell "tore it up bad" and threw his property outside of the cell. Makdessi stated that he did not receive any disciplinary charge as a result of the search.

Makdessi submitted into evidence an Inmate Request For Information/Service form he filed on April 27, 2015, on which he claimed that his prescription reading glasses were cracked when he was injured on March 17, 2015. (Plaintiff's

–23–

Exhibit No. 32, (Docket Item No. 92-26)). The form inquired as to why he had not been given free replacement glasses. P. Harless from Medical responded on April 30, 2015, stating, "The glasses that I have in medical are not approved. Your name has been placed on the list."

Makdessi testified that Raiford came to his cell on June 1, 2015, and told him that he would never get single-cell status. According to Makdessi, Raiford told him that she had "trashed" his request and that she would talk to the Mental Health Department to make sure that they did not recommend he get single-cell status. He said that Raiford told him, "We've got plans to get the pod feeder down here." Then she walked away. On June 11, 2015, Makdessi said that Raiford, Adams and Gallihar placed Inmate Cobler in the cell with him against his will. Makdessi said that Correctional Officer Chandler asked him to sign Plaintiff's Exhibit No. 6, a waiver to allow Cobler to be placed in the cell with Makdessi. Makdessi said that he told Chandler he could not sign the waiver because he had filed sexual harassment charges against Cobler when they were housed at River North. He said that Chandler went and got Officer Taylor, who said, "Either sign or go to [segregation] for a ass whooping." Makdessi said that he took the form and wrote "against my will" on the signature line. He said that Cobler was then placed in the cell with him. What is written on the line for the Offender's Signature on Plaintiff's Exhibit No. 6 is illegible to the court.

Makdessi testified that Cobler started swearing and yelling at him and calling him a snitch. He said that Cobler punched him in the ribs and head and threatened him not to "snitch" to anyone. Makdessi said that Cobler reached under his bed for his commissary items and that he told him to help himself because he feared for his safety and he thought giving it to Cobler would keep Cobler from

–24–

physically or sexually assaulting him. He said that Cobler told him that he wanted Makdessi to perform oral sex on him. He said that Cobler told him that he was placed in Makdessi's cell by Lt. Adams to take care of Makdessi. He said that Cobler told him to drop all his lawsuits and to stop filing Complaints.

Makdessi said that as soon as Cobler took a nap, he started writing and wrote what he filed as Docket Item No. 24. Makdessi said that he could not get an Informal Complaint form, so he filed a Grievance based on Cobler being placed in his cell. Makdessi stated that every time Cobler wanted his food, he gave it to him or Cobler would yell at him and threaten him. Makdessi testified that Cobler was housed in the cell with him from June 11 to June 26, and, during this time, Cobler assaulted him up to five times. Makdessi said that on June 17, Cobler came up to him wearing only his undershorts with his "junk" hanging out and said, "Why don't you just perform…." Makdessi said that Cobler ate most of his food trays and $100 worth of his commissary food during the time they were housed in the same cell.

Makdessi said that he spoke with an attorney who was representing him in his case against Gallihar on June 16, 2015, and told him that he was afraid he was close to being sexually assaulted by Cobler. Makdessi said that, on this attorney's advice, he took a note explaining his situation to the chow hall to give to a sergeant. On June 17, while in the chow hall, Makdessi said that he asked Raiford if she got his form. She told him that she did not get it, but she was "looking forward to getting it." Makdessi said on June 30, Meade told him that Raiford was not happy and threw the paper away. He testified that Meade said, "That's another lawsuit you can file," and laughed.

Makdessi said, on June 23, 2015, Lt. Adams, White and another correctional officer came to his cell and looked angry. He said that both Lt. Adams and White said, "The judge is going to laugh at you." He said that Adams called him a retard and a few other names.

Makdessi said that Cobler punched him in the ribs on the afternoon of June 23. He said that Cobler yelled at him and told him to drop his lawsuits. He said that on June 23, 24 and 25, Cobler walked up to him with only shorts on with his "junk" hanging out. Makdessi said that each time he paid Cobler off with commissary food. Makdessi said that Cobler was removed from his cell on June 26. He said that Adams told him, "You will pay for not dropping your lawsuits. I knew who you were the first day you arrived. I watched your documentary on tv. You're a troublemaker. You are a big time paper pusher."

Makdessi said that he asked Lt. Adams if they could "start over." He said that Lt. Adams told him that he better keep his mouth shut about Cobler. He said, "I can make you a level 6 inmate. We can find drugs or a weapon on you at any time. We will plant drugs or a weapon or send you to long-term [segregation] and whip your ass."

Makdessi said that White came to his cell door on June 26, 2015, and told him that he was one of the correctional officers who had been poisoning Makdessi's food. Makdessi said that White came back later and said he "wished Hitler had killed all your family so you would never been born." Makdessi also testified that he was under duress when he participated in a hearing with the court by video conference on June 30, 2015. He said that he was in pain because his leg

irons were chained to the floor. He said that he was threatened by Lt. Adams and White not to testify about Cobler at that hearing.

Makdessi testified that he complained on June 30, 2015, about the lack of mental health treatment, but he did not specify to whom he made these complaints. Makdessi stated that it was July 24, 2015, before he was diagnosed with post-traumatic stress disorder and began receiving Prozac. Makdessi introduced into evidence a note dated July 15, 2015, which he wrote and directed to the Mental Health Department seeking single-cell status. (Plaintiff's Exhibit No. 19, (Docket Item No. 92-13)). Makdessi testified that Red Onion's psychiatrist, Dr. E. McDuffy, M.D., signed this note stating that Makdessi's diagnosis was post-traumatic stress disorder.

Makdessi said that on July 8, 2015, Taylor and Chandler allowed Cobler out of his top tier cell to help with the laundry on the bottom tier. He said that Cobler kept coming close to his cell and threatening him. Makdessi testified that Cobler came up to the crack in his cell door at 1:10 p.m., 1:12 p.m., 1:23 p.m., 1:32 p.m. and 1:36 p.m. He said that Cobler told him that Lt. Adams had destroyed the Grievances Makdessi had filed about Cobler's sexual harassment. A video recording from the D-1 pod surveillance cameras, taken from 1:22 to 1:39 p.m. on July 8, shows that Cobler walked to Makdessi's cell at 1:12, left a bag and walked away. It showed that no one was at Makdessi's door after that.

Makdessi testified that Assistant Warden Hamilton came by his cell with Lt. Gilbert at 2:30 p.m. on July 9, 2015, and told him that they were going to place another inmate like Cobler in the cell with him. According to Makdessi, Hamilton said, "He will set you straight." Makdessi said that Hamilton told him he would

never get single-cell status. Makdessi said Hamilton said, "I don't care about the Fourth Circuit, and I don't care about the court."

Makdessi testified that, on July 10, 2015, a K-9 officer who he had previously testified against on June 30 told him to go back to his cell at breakfast. He said, "No food for you." Makdessi said he was not given a breakfast tray that day. He said that he did get a lunch tray that day. In fact, he said there were many days when he was sent away from the chow hall without a food tray, but he did not give any specific dates.

Makdessi testified that, later that day, White came to his cell for count and said, "Get the f--- out of bed. You are punished. You don't get out for rec." Makdessi said that White came back at 2:10 p.m. and threatened him because he had asked for a Complaint form when he did not get a breakfast tray. He said that White told him, "You don't ask for a complaint, ever. You will never learn your lesson."

On July 15, 2015, at 6:29 a.m., according to Makdessi, White shoved his breakfast tray through the tray slot in his cell door and then closed the slot without giving Makdessi any milk. Makdessi said that White opened the tray slot back up and "threw" the milk at him then whispered, "How would you like a big penis up your anus?" During lunch that day, Makdessi said, White threw Makdessi's coffee on the floor and told him to get on his knees and clean it up. Makdessi said that he squatted down and cleaned up the coffee. He also said that Cobler came by his cell several times at 3:05 p.m. and made "threats." Makdessi did not testify to any specific threats made by Cobler, however.

Makdessi said that on July 18, 2015, he was not allowed out of his cell to receive his breakfast tray because Cobler was serving the trays. He conceded that a breakfast tray was brought to him that morning.

Makdessi also testified that, at 5:14 p.m. on July 25, 2015, White kicked Makdessi's cell door, threatened him and then left. Makdessi, again, did not testify as to what White said. Makdessi said that he was taken to the D-1 pod office on July 28, 2015, at 8:50 a.m. to view video recordings he had requested in this case. Makdessi stated that he was shackled in such a way to prevent him from actually seeing the video and to cause him pain. Makdessi did not state exactly how he was shackled. He did admit, however, that he requested to be returned to his cell without viewing the video recordings.

Makdessi testified that, on July 29, 2015, White allowed Cobler to come to the bottom tier of the pod to work distributing inmate laundry. Makdessi stated that Cobler came to his cell and made "threats and harassments" through the crack around the cell door. Again, Makdessi did not testify as to what Cobler said to him. Instead, Makdessi testified, "no need to say any more" about that.

On July 30, 2015, according to Makdessi, White came to his cell door at 10:37 a.m. and said that he was sick and tired of Makdessi filing Complaints. Makdessi said that White threatened to plant a weapon on him and send him to segregation. White said that he was just waiting on the "green light" from Raiford, Gallihar and Adams, according to Makdessi. Makdessi testified that, on July 31, 2015, he was told by the witnesses on his witness list that they had all been threatened. He said that the witnesses told him that they no longer wanted to

testify for him due to these threats. He said that after this day, none of the inmates in the pod would talk to him, and they all looked at him with anger.

On August 3, 2015, at 9:55 a.m., Makdessi stated that, just after he got his lunch tray and juice, White called him over and told him to place his hands on the wall. Makdessi said that White made it look like he was frisking him, but he then felt White put something in his pocket. Makdessi said that he told White, "Go ahead and plant a weapon just like you threatened." He said that White told him to put his hands behind his back to be cuffed. Makdessi said that he refused and showed White the front cuff order that he carried with him. Makdessi said that White then cuffed him in front and put him on a leash and escorted him to the pod vestibule.

Once in the pod vestibule, Makdessi said that Meade told him, "We got you. That is what you get for filing a lot of lawsuits." Makdessi said that he told Meade that he had reported to the court their threats to set him up. He said that White told him, "We told you not to tell the court about Cobler." Makdessi stated that White then removed a half-broken indigent razor from Makdessi's back pocket.

Makdessi testified that the officers then took him to a cell in segregation. He said that White said, "We promised you we would put you in long-term seg." He also testified that, as White escorted him to the segregation cell, White put his hand on his left shoulder and squeezed it, causing him pain. Makdessi said that he asked White to quit squeezing his shoulder, but White told him, "I will squeeze it if I want to." Makdessi said that, as White was taking him to a top tier cell in segregation, he told White that he had a front cuff, bottom tier, bottom bunk order. Makdessi said that he told White that he could not walk up stairs. According to

–30–

Makdessi, White responded, "You are going to walk up those stairs." Makdessi said that he did not get anything to eat that day until approximately 4 p.m.

Makdessi introduced into evidence an Inmate Request For Information/Service form dated July 5, 2015, and directed to the Medical Department. (Plaintiff's Exhibit No. 18, (Docket Item No. 92-12)). On this form, Makdessi requested to see a doctor for an injury to his back on January 8, 2015, a reinjury of his shoulder on March 17, 2015, and a head injury that was causing him to suffer from amnesia and chronic headaches. Makdessi stated that his symptoms were making his depression worse. He also complained, "Every time the officers make[] me get on my knees and [kneel] I get in so much more pain and makes my back worse." The form continued, "I will need 1. no kneeling and 2. no moving my shoulder above my chest and 3. bottom bunk 4. bottom [tier] 6. [sic] single cell status, 7. no lifting orders." Makdessi also introduced into evidence an order signed by D. Yates, R.N., and dated July 16, 2015, stating that he needed a bottom bunk on the bottom tier for one year. (Plaintiff's Exhibit No. 17, (Docket Item No. 92-11)).

Makdessi said that White placed him in cell D-318, a corner cell that was hard to see on the rapid eye surveillance video recordings. As they approached the cell, White told Makdessi to get down on his knees to allow White to remove leg irons. Makdessi said that White told him, "We told you we would get you, and there is nothing the judge can do to protect you." Later that day, Makdessi said, White and two other correctional officers brought him his legal property, a mattress and a pillow. Makdessi said that he was restrained and ordered to step outside of the cell. He said that White was acting really angry and took his legal papers and threw them on his bed. According to Makdessi, White then urinated on

the pillow and mattress and said, "You pussy, do something about it. Are you going to do something?" Makdessi said that he told White, "You know I am going to write the judge and tell her about it."

Makdessi said that White then told him to kneel down to take the leg irons off. He said that White placed his hand on Makdessi's left shoulder and pushed him down and "slammed" his knees to the floor. Makdessi said that he could feel a bone break in his right knee when this happened. Makdessi stated that he has filed about 20 request forms asking to be seen by a doctor for the injury to his knees he suffered in this instance. He admitted that an unidentified nurse came and "looked" at his knee during sick call on August 18, 2015. He said that, on this day, his right knee was swollen and "huge," and his left knee was a little swollen. Makdessi said that he asked the nurse to see a doctor, and she told him that a doctor would not see him until he was in a wheelchair. He said that the nurse told him he already was taking Motrin.

Makdessi said that he was given a disciplinary charge for possessing a razor on August 3, 2015. He said that he was found guilty of this offense. He also said that he has appealed this conviction. He said that Red Onion inmates could purchase only two razors at a time and have only two razors at a time. On the date of the hearing, Makdessi introduced a Disciplinary Offense Report, showing that he was found guilty of an unspecified charge on August 12, 2015, and fined $12.00. (Plaintiff's Exhibit No. 21, (Docket Item No. 92-15)). This Report reflects that Makdessi pleaded not guilty and stated that correctional officers had threatened to plant a weapon on him. Also, the Report reflects that Makdessi claimed that "he has been extorted for money by other offenders." Makdessi also introduced into evidence a Disciplinary Appeal dated August 14, 2015. (Plaintiff's

Exhibit No. 22, (Docket Item No. 92-16)). Makdessi stated that he had not received a receipt for filing this Appeal. Makdessi stated that he had asked the Warden if he had received his appeal, and he responded, "What appeal?" Makdessi testified that he still was being held in segregation. He said that he had been told that the officers wanted to keep him in segregation for 90 days, at least.

Makdessi offered into evidence an Informal Complaint form he said that he filed on August 3, 2015. (Plaintiff's Exhibit No. 23, (Docket Item No. 92-17)). On this form, Makdessi wrote that White had planted a razor in Makdessi's back pocket "just as he and all defendants had threatened to do." Makdessi also claimed on this form that White assaulted him at 10 a.m. that day when White squeezed his injured shoulder hard and, again, at 3 p.m. when White pushed down and slammed Makdessi's knees to the ground. He also complained that White urinated on his pillow and mattress. Makdessi testified that he had never received any receipt for filing this form and had never received any response. Makdessi said that the next day White came to his cell door and told him that he knew he had filed the Informal Complaint.

Makdessi testified that White cut Makdessi's finger badly when he closed the tray slot door on it when Makdessi retrieved his breakfast tray at 6:20 a.m. on August 4, 2015. Makdessi said that he later showed his injury to a nurse, who said that it was "just a scratch" and refused to render any treatment. He said that the cut took approximately a month to heal.

Makdessi stated that Assistant Warden Hamilton came to his cell door on August 5, 2015, and asked him what had happened. Makdessi said that he told Hamilton, "You know I got set up." He said that Hamilton replied, "Don't look at

-33-

me on this. You know if I wanted to set you up, I would plant a machete. You know me. You know what I can do." Makdessi claims that this last statement was a reference to Hamilton performing some unspecified type of "torture" on him in the x-ray room at Wallens Ridge. Makdessi also testified that Lt. Adams and a counselor came to his cell on August 5, 2015, at 11:10 a.m. and asked if he wanted to plead guilty to the charge of possessing the razor. Makdessi testified that, at his disciplinary hearing on August 12, 2015, he was found guilty of possessing the razor.

Makdessi submitted into evidence a Regular Grievance form that he stated that he sent to the court, the Warden and VDOC Director Harold Clarke on August 5, 2015. (Plaintiff's Exhibit No. 26 (Docket Item No. 92-20)). On this form, Makdessi complained that he had not been able to get "one Informal Complaint in prison." The form also states:

> I am in fear for my life from this prison and all named defendants in my law suit, and in fear for my life from this fake protective custody, because I have so much threats with any inmate you place in my cell, and because the named Defendants and Officer Taylor and Chandler by orders from Gallihar, Hamilton, Raiford, G.A. Adams, and White, have placed inmate Cobler in my cell against my will, even after I told them I had filed sexual harassment charges on him, they placed him in my cell and he assaulted me sexually and physically and extorted all my food and commissary. The named officials they all make inmates in the p/c pod threaten me, and retaliate against me, and extort me, and then I get set up by planting a razor on me…. I will need all the following to be placed on my enemy list C. Cobler #1096311 filed sexual harassment on him on 4-4-2013 and sexual assault from 6-11-2015 to 6-26-2015 and extortion. Jason Morgan, he was placed in segregation for three month[s] when I filed sexual harassment and extortion charges on him around 4-29-2015. Peter Martin #1409806, and Virgil Lee Hawks #1088343 both had

extorted me for three years and when they demanded $250.00 in each of their accounts I reported them to the Federal Court on 11-26-2014 in case #7:13-cv-79. J. Penn, D-106-B he had been extorting me for the past few years and when I [stopped] last month he threatened my life and said he will hurt me. Jimmie Johnson #1186063 filed grievance on him Dec. 1, 2014, and who had threatened my life and safety and extorted me for three years. Kenneth Christopher #1198405 and Veto Hoehn #1006311 and Tyare Riddick # 1062784 They are Gangster[] Disciples who assaulted me on 12-21-2010 and attempted to murder me. There are so many unknown names I would add from this fake p/c pod.

In response to the question, "What action do you want taken?" on the form, Makdessi wrote, "I want to be in another protective custody pod with single cell status, away from all … prison officials who want to see me dead and keep assaulting me and planting razor on me, and retaliating against me, away from this fake protective custody pod, away from all the inmates who hates me and extort me and help officers plant razor on me."  Makdessi stated that since he had filed this form, he had not been celled with any of the inmates listed on the form.

Makdessi testified that, on August 7, 2015, at 10 a.m., White came to his cell and "threatened" him because Madkessi had filed "paperwork" claiming that White had cut his finger with the tray slot door. Makdessi said that White said he was going to restrain Makdessi and told Makdessi to place his hands through the tray slot so he could cuff him. Makdessi said that he refused White's order and pushed the emergency alert button in his cell. Makdessi said that White told him that the emergency alert button had been disconnected. Makdessi said that he asked for an Emergency Grievance form, but he did not testify to whom he made this request.

–35–

Makdessi testified that, at 3:28 p.m. on August 7, inmate J. Penn was placed in the cell with him. Makdessi said that this was the inmate who prison officials claimed had reported that Makdessi was attempting to sell a razor. Makdessi said that he heard Meade tell Penn, "Why did you put a razor in Makdessi's back pocket? Next time just walk up and beat him up."

Makdessi said that, at 6:40 a.m. on August 8, 2015, White came to his cell and asked how he liked "the big penis in my ass at Wallens Ridge." Makdessi said that White came back to his cell door later in the day and told him, "We all know you have a problem with Gallihar. If you keep me out of [your] lawsuits, I will treat you nice. Do we have a deal?" He said that White told him that he would not put anything more in his food. Makdessi said that he told White, "We have a deal." He said that White told him that he would talk to Lt. Adams, saying "We are close, but I don't know about anybody else."

Makdessi said that, at 7:08 a.m. on August 9, 2015, White came in his cell and cuffed Makdessi, but did not put leg irons on Makdessi. Makdessi said that the correctional officers were supposed to put leg irons on the inmates when they searched a cell. Makdessi said that White was "acting nice" as he went through Makdessi's property. Makdessi said that White asked him, "Do we still have the deal?" Makdessi said he replied, "Oh yes, we still have a deal." Makdessi said that White said, "I will treat you nice from now on." He said that Correctional Officer Bundy was present and witnessed this conversation with White.

Makdessi said that, on August 10, 2015, at 3:57 p.m., he asked Raiford when he was getting out of segregation. He said that she told him, "You just got here."

Makdessi stated that on the next day, August 11, 2015, he was moved from cell 318 to cell 301 on the bottom tier.

Makdessi submitted into evidence a Regular Grievance form dated August 11, 2015. (Plaintiff's Exhibit No. 29, (Docket Item No. 92-23)). On this form, Makdessi wrote: "No need for informal process for an alleged incident of sexual abuse." He further wrote:

> Due to sexual harassments for the past three years in protective custody by inmates, I had to pay over $700.00 of commissary of extortion for inmates to leave me be, Inmate J. Penn have extorted about $100 from me for the past year and half in order to leave me be and not sexually harass me. Inmate C. Cobler had been the most threatening, he had sexually harassed me for 21/2 years [until] I reported him on 4-4-2014 and 4-29-2014 at River North prison, and he was placed in my cell on 6-11-2015 and he assaulted me and sexually harassed me and took all my commissary and food [until] I filed sexual harassment on him with the court and he was removed on 6-26-2015. For the past five month in this protective custody pod at Red Onion I have been paying inmates to leave me alone and not sexually harass me and not threaten me, I have paid about $170.00 in the past five months in this protective custody pod. Look at the security video and you will see me bringin[g] out two or three soups every night in my front and back pocket, and also bring coffee, so inmates will leave me alone and not threaten me, and not sexually harass me, I [always] walk alone in the pod, because I am [too] scared to be around inmates. I was sexually harassed also by Peter Martin and Lee Hawks, they also extorted me and took over $100 of commissary [until] the demanded $250.00 in each of their accounts [until] I reported them and told the Court about them, because the prison did not want to investigate and did not want to place them on my enemy list when I requested it so many times. I sent so much Complaints in the past five months that was destroyed.

In response to the question, "What action do you want taken?" on the form, Makdessi wrote, "I just want to do my time without sexual harassments and without threats, I wanted to be in a single cell status, but no one will help. Prison officials [want] to keep placing inmate cellmate with me and I could never get along with anyone because I am short and weak, and everyone wants to take advantage."

Makdessi testified that, on August 13, 2015, he was called to the Investigator's office regarding the sexual harassment charges he had filed against Cobler. Makdessi said that he told them that Cobler had recently confessed in court. He said he also told them that Raiford was present in court and heard this confession and should have reported it.

Makdessi said that, on August 16, 2015, he asked a nurse to be placed on sick call regarding the injury to his knees.

Makdessi testified that, on August 17, 2015, between 3 and 3:25 p.m., Hamilton and Gallihar came to his cell and told him that he would be in segregation for 90 days. Makdessi said that he asked them why he had not been released from segregation and that Hamilton said, "You know why you are not out, you keep filing lawsuits." Makdessi stated that Gallihar said, "What are you going to do to me?"

Makdessi said that, on August 18, 2015, at 7:05 a.m., a nurse came to do sick call on his hearing and on his knees. Makdessi said that later that day, at 1:54 p.m., Meade was at his cell door, and Makdessi asked him if he had received a

subpoena to come to court. Makdessi said that Meade stated, "It won't do any good. I will just lie."

Makdessi testified that, on August 20, 2015, he saw the doctor for his knee. He said that the doctor told him, "That looks bad. I am going to give you something for that." Makdessi said that the nurse told the doctor that he was already on pain medication. He also said that he was not sure if this was part of the retaliation against him or not.

Makdessi testified that, on August 22, 2015, at 10 a.m., White came to his cell door and said, "I know that you did not take my name off [of the lawsuit]. I thought we had a deal." Makdessi said that White appeared angry, and he just turned around and left. Makdessi testified that since that day, everyone who came to his cell did not say much at all.

Makdessi stated that he had lost 10 pounds in the previous month. He stated that every time he took a food tray from Officer White, the food tastes like cleaning chemical, and he vomits it back up. He testified that White told him he was poisoning him.

At the August hearing, Makdessi called a number of inmate witnesses. One of these inmate witnesses, Mitchell Nicholas, testified that he arrived at Red Onion with Makdessi on March 17, 2015. He stated that he saw Makdessi for about five minutes in a hallway once taken inside the prison building that day. According to Nicholas, Makdessi stated that he was in pain, and his shoulder was hurting him. Nicholas also testified that when he saw Makdessi, his hands were cuffed to the front.

Nicholas specifically testified that he did not see any officers assault Makdessi upon his arrival at Red Onion on March 17, 2015. He said that he did not see any officer smash Makdessi's head into the wall, nor did he see any blood on Makdessi's face that day.

Nicholas stated that he was placed in the D-109 cell, next to Makdessi in D-108. He stated that he did remember Raiford making rounds in the pod on March 17, 2015, but he did not recall a K-9 officer being with her, nor did he hear any dog barking in the pod. Nicholas also testified that he did not recall Officer White ever harassing Makdessi or even raising his voice at him. Nicholas did testify that it was difficult for all inmates to get Informal Complaint forms at that time. In fact, he said that it was much more difficult to get these forms at Red Onion than at Keen Mountain Correctional Center, ("Keen Mountain"), or River North. Nicholas also conceded, however, that he had never requested a Complaint form at Red Onion, and, therefore, he had never been denied a form. Nicholas said that he did see Makdessi request an Emergency Grievance form the first week they were at Red Onion, but he said that he did not know whether the form was provided to Makdessi or not.

Nicholas said that he did not see or hear White call Makdessi out of the lunch line on August 3, 2015. Nicholas said that he had never known Makdessi to carry a weapon and that he had never heard any rumors about officers planning to plant a weapon on Makdessi. Nicholas testified that inmates at Red Onion could purchase razors from the commissary and, to purchase a new razor, an inmate had to exchange an old razor. Nicholas said that the razors purchased at the prison commissary were green and white. Nicholas also testified that the prison provided

orange razors to indigent inmates. Nicholas said that indigent inmates had to turn in an old razor to be given a new one.

Nicholas testified that Makdessi was known among the inmates as a chronic Complaint filer. Nevertheless, he said that he had never heard any staff member threaten Makdessi due to him filing Complaints. Nicholas also testified that he never heard anyone tell any inmate not to be a witness for Makdessi. Nicholas said that no one had threatened him over testifying and that he had never heard anyone threaten Makdessi. He said that he did not recall ever seeing a picture of Adolf Hitler in Lt. Adams's office.

Nicholas testified that he recalled that when Makdessi was moved between pods at River North, he heard Makdessi ask Sgt. Jones and Unit Manager Doss for a cart. He stated that he recalled Makdessi complaining that he could not carry his property, although he did recall that Makdessi carried some light items that day. Nicholas stated that he helped Makdessi carry his property that day. Nicholas said that he did not know why a cart was not provided for Makdessi, but he stated that no inmate was provided a cart.

Inmate William Henry Stewart also testified that no one had ever threatened him or asked him not to testify for Makdessi. Stewart stated that he had never heard Officer White threaten Makdessi. Stewart testified that Makdessi bribed him into signing a July 4, 2015, Affidavit that Makdessi filed with the court. (Docket Item No. 32-1.) He stated that Makdessi gave him peanut brittle and coffee in exchange for signing at least three affidavits. Stewart said that Makdessi told him that, if he won his lawsuit, he would provide Stewart with more goods from his holiday package. Stewart testified that the facts alleged in his Affidavit were not

true. Stewart testified that, on July 31, 2015, he told Makdessi that he would not lie in court if he was called to testify.

Red Onion Inmate Michael Arthaniel Harrison testified at the hearing that it was easy for inmates to obtain Informal Complaint and Grievance forms at Red Onion. He stated that he has never gotten any forms for Makdessi. Harrison said that he did not recall ever hearing White tell Makdessi that he wished that Hitler had killed his family so Makdessi never would have been born. Harrison stated that on July 31, 2015, he had asked Makdessi to drop him off of his witness list. Harrison testified that Makdessi had offered him $150.00 to sign an affidavit that Makdessi wrote. Harrison said that Makdessi had given him and other inmates coffee, peanut brittle and soup to sign affidavits for him. Harrison specifically denied that anyone had threatened him because he had signed an affidavit for Makdessi or because he was identified as being a witness for Makdessi. He also specifically denied that he had told Makdessi that he had been threatened.

Harrison said that Makdessi would give him and other inmates cocoa packets full of coffee almost every day. He said that Makdessi would say, "I got to take care of my witnesses." Harrison agreed that he had seen Makdessi give other inmates coffee and other food, but he said that he did not know whether these other inmates were witnesses for Makdessi or not.

Harrison specifically denied that he had ever seen or heard Raiford or Lt. Adams threaten Makdessi. He said that Raiford routinely made rounds in the pod, adding, "She just does her job when she is there."

–42–

Harrison also told the court, "Makdessi lives in a magical world. He is paranoid. Every time Raiford or Lt. Adams comes into the pod he thinks they are out to get him."

Red Onion Inmate Michael Anthony Wilson also testified at the evidentiary hearing. Wilson said that, on July 31, 2015, he asked Makdessi to drop him off of his witness list. Wilson said that Makdessi had offered to deposit $150.00 in his inmate account if he would sign an affidavit for Makdessi. Wilson said that Makdessi wrote the affidavit, and he signed it. Wilson said that Makdessi gave him soups, peanut brittle and coffee in exchange for signing the affidavit.

Wilson specifically denied that anyone had threatened him in an effort to persuade him not to testify. Wilson said that he did not even know Makdessi.

Major Gallihar also testified at the August hearing. Gallihar testified that he sat down with Makdessi and Raiford on March 26, 2015, because Makdessi had asked to speak with him during rounds. Gallihar said that he held the meeting at a table in the pod open area within view of the surveillance cameras because he knew that Makdessi had made multiple allegations against officers in the past. Gallihar testified that he did not recall Makdessi asking him why he could not get Informal Request forms. Gallihar testified that he recalled that Makdessi complained of Raiford speaking to him angrily, but he said he did not recall Makdessi claiming that Lt. Adams or White had threatened him. He said that he also recalled Makdessi complaining about having his hands cuffed to the back upon his arrival at Red Onion. Gallihar also testified that he did not know why the protective custody unit was moved to Red Onion and that he had no input in that decision.

Gallihar testified that being designated as "protective custody" was a security level. Gallihar testified that, according to VDOC policy, any inmate serving a life sentence, multiple life sentences or "life plus" sentence, must serve 20 years before they would be designated a security level 3. Gallihar testified that Dillwyn is a security level 2 protective custody unit, and the protective custody unit at Red Onion is a security level 4.

Gallihar testified that cell assignments were made by the unit managers at Red Onion, and then security officers would put the inmates in the cells as instructed by the unit managers. Gallihar testified that building lieutenants used to make these decisions before the VDOC started using unit managers. Gallihar specifically denied that he made any decision with regard to Makdessi's cell assignments at Red Onion. He stated that he did not make the decision to assign Cobler to be Makdessi's cellmate. He also stated that he was not aware that Makdessi had ever filed sexual harassment charges against Cobler. Gallihar said that he remembers Makdessi requesting a single-cell assignment, but he denied ever telling Makdessi that he would see that he never got single-cell status. He said, typically, an inmate will make a single-cell request by writing to the Medical or Mental Health Departments. That department, Gallihar said, would then review its records to see if it would recommend a single-cell assignment.

Gallihar stated that he was not at Red Onion when Makdessi arrived there on March 17, 2015. He specifically denied that he had ever told anyone to threaten or assault Makdessi. He stated that he has never retaliated against Makdessi for filing suit against him. Gallihar stated that he had worked for the VDOC for 21 years, that he had been named in a "handful" of lawsuits and that it was "sort of part of the job." He testified that he did not know if an incident report was ever filed

–44–

regarding Makdessi's hands being cuffed to the back upon his arrival at Red Onion.

Gallihar testified that a report that an inmate possessed a weapon was justification to search the inmate and his cell to determine if it were true.

Gallihar stated that, on April 23, 2015, about 50 correctional officers were at Red Onion to assist with a prisonwide search or "shakedown." Gallihar stated that he did recall that Makdessi was taken to the shower area and strip searched, but he did not recall that Makdessi was left standing naked in front of all the other inmates in the pod. Gallihar stated that there were narcotic and contraband sniffing dogs present to assist in the search that day. Gallihar stated that Makdessi was strip searched because a dog alerted on his cell. He admitted that no drugs were found in Makdessi's cell that day.

Gallihar said that no one damaged any of Makdessi's property when his cell was searched on April 23. He testified that he was not aware of any officer urinating in Makdessi's cell or on his food that day. Gallihar stated that it would have been impossible for an officer to do this without being observed by others.

Gallihar also testified that he has never denied food to any inmate. He also said that this was the first time he had ever heard that Makdessi was claiming that he had been denied food. Gallihar said that it was possible that a disruptive inmate would be sent back to his cell from the chow hall without eating, but that he would be offered a tray to eat in his cell.

–45–

Gallihar stated that he did not recall any injury to Makdessi's knees on August 3, 2015. He stated that he did not recall receiving any Complaints or Grievances from Makdessi while he had been housed at Red Onion. In fact, he said that he did not recall Makdessi ever asking him for a Grievance or Complaint. He specifically denied that he had ever destroyed any of Makdessi's administrative remedies forms. He stated that he had never read Makdessi's legal mail, and he had no reason to believe that any other officer had done so.

The Director of Nursing/Health Authority at Red Onion, Vicky L. Phipps, also testified at the evidentiary hearing. Phipps admitted that Makdessi's VDOC medical records contain a note made by a doctor at River North on October 2, 2014, stating "please cuff in front." (Plaintiff's Exhibit No. 31 (Docket Item No. 92-25)). Phipps testified that she did not consider this medical note a valid front cuff order because it did not have a time frame indicated. Phipps stated that indefinite orders are not supposed to be written and that all doctor's orders should contain a time frame.

Phipps said that she did not recall getting any requests for sick call from Makdessi for a knee injury. Phipps testified that Makdessi was seen on sick call on August 18, 2015, regarding a complaint of loss of hearing in both ears. Phipps stated that Jonna Myers, R.N., wrote that Makdessi also complained of both knees hurting and being swollen on this date. Phipps stated that Myers did not refer Makdessi to the doctor on this date because he had a steady gait with normal muscle tone and no swelling noted in either knee, and he already was receiving Motrin and Excedrin. Phipps stated that there was no reason for Makdessi to be referred to see a doctor on this date.

Phipps testified that, beginning August 10, 2015, inmates could request to be seen on sick call by providing a written request to the nurse conducting pill pass. Before that date, she stated that the inmates had to submit a written form through the institutional mail. Phipps stated that the Inmate Request for Information/Service form submitted as Plaintiff's Exhibit No. 33, (Docket Item No. 92-27), was such a form, but she stated that this form had never been received by the Medical Department. She said that, when these forms were received by the Medical Department, they was stamped received and sent back to the inmate, stating that he had been scheduled for sick call.

Phipps stated that Plaintiff's Exhibit No. 18, (Docket Item No. 92-12), had been received by the Medical Department. She stated that the form contained a stamp stating that it was received by the Medical Department on July 9, 2015, and contained a stamped response stating that Makdessi had been scheduled for sick call.

Phipps stated that she was not aware of a doctor seeing Makdessi on August 20, 2015. She also stated that she did not know what nurse performed sick call in the D segregation pod on August 20, 2015.

Phipps stated that Makdessi's medical file showed that he was seen by Dr. McDuffy on July 24, 2015. On this date, according to Phipps, Dr. McDuffy noted that Makdessi complained of suffering from post-traumatic stress disorder. She stated that Dr. McDuffy noted that it was possible that Makdessi was exaggerating his symptoms to be placed on single-cell status. She said that Dr. McDuffy prescribed Prozac for Makdessi.

–47–

Phipps testified that every Red Onion inmate who requests to be seen on sick call is seen by a nurse. The nurse then decides whether the inmate needs to be seen by a doctor.

Phipps testified that there was nothing in Makdessi's medical record showing that he was injured on March 17, 2015. There was no note that his head was bleeding and no report from him that he was assaulted. Phipps stated that Makdessi's records show that an intake examination was performed on him by Dr. Mullins on April 2, 2015.

Phipps stated that Makdessi's medical file indicated that Nurse Mullins had entered a front cuff order for Makdessi upon his arrival at Red Onion on March 17, 2015. Phipps testified that it was likely that when Nurse Mullins reviewed Makdessi's medical file from River North, she saw that it contained a front cuff order, and she wrote a front cuff order until Makdessi could be seen by a doctor. Phipps said that Dr. Mullins also wrote an order for Makdessi to be cuffed in front when he saw him on April 2.

Phipps stated that she saw Makdessi on March 17, 2015, upon his arrival at Red Onion. She said that Makdessi voiced no complaint of shoulder pain whatsoever and no complaint of assault or injury on that day. She said that Makdessi did not ask her about a front cuff order on that day. She stated that none of the nurses would have seen Makdessi's medical records from River North until later that evening. Phipps stated that she did not review Makdessi's medical records from River North on March 17.

Phipps testified that, if an inmate came to Red Onion with eyeglasses that were a different style than the approved style, the eyeglasses were confiscated, and the inmate would be put on the list to be seen by the optometrist to be issued approved eyeglasses. Phipps also testified that Makdessi's medical records contained no indication that he had ever complained to the medical staff that his food was being poisoned.

Red Onion Unit Manager Tori Raiford also testified at the evidentiary hearing. Raiford stated that being a high-profile inmate would not qualify a Red Onion inmate for single-cell status. She also stated that problems with cellmates would not always qualify an inmate for single-cell status. She said that inmates with medical and mental health problems can qualify for single-cell status. Raiford testified that Mental Health did not manage cell assignments.

Raiford stated that an inmate can request single-cell status by filling out a request form. Raiford stated that she was "well aware" that Makdessi was requesting single-cell status. Raiford testified that Makdessi had not been granted single-cell status at Red Onion. She stated that no one from Red Onion's Medical or Mental Health Departments had ever indicated that Makdessi needed single-cell status. She said that a diagnosis of post-traumatic stress disorder would not prevent an inmate from being placed in a cell with another inmate. Raiford testified that she had never seen Plaintiff's Exhibit No. 15, (Docket Item No. 92-10). She said that it appeared to be a request form sent from Makdessi to Warden Barksdale requesting single-cell status.

Raiford also testified that an inmate is not placed in segregation because he refuses to sign a waiver to agree to have a particular inmate placed in a cell with

him.  She stated that inmates can be placed in a cell together regardless of whether they agree to the placement or not. Raiford stated that, before two inmates were housed together, a counselor would contact Intelligence to determine if there was any known compatibility problem. Raiford stated that the unit managers have final approval of who goes into a cell together.

Raiford stated that, as part of her job as unit manager, she tried to visit every pod in her unit on every day that she worked.  Raiford said that she did not recall Makdessi ever asking her for an Informal Complaint form.  She also said that she did not recall ever receiving a request or Informal Complaint form from Makdessi. Raiford testified that she remembers sitting down with Makdessi and Gallihar in the pod on March 26, 2015.  Raiford stated that she did not specifically recall the discussion because she thought she was there simply to witness the interaction between Gallihar and Makdessi.  She stated that she did remember that she told Makdessi he would receive a cellmate.

Raiford specifically denied that she had ever told Makdessi that she would let one of the K-9 officers' dogs bite him.  She also denied that she had ever told him to shut up and sit down on his bunk.  She also specifically denied that she had ever told Makdessi that she was going to put a cellmate in his cell to assault him or ever told him that she was going to tear his arm off.  She denied that she had ever told any other inmate that Makdessi was a "snitch." She also specifically denied that she had ever told Makdessi that she was going to instruct the mental health workers not to see Makdessi.  She said that she had never threatened to poison Makdessi.  Raiford said that she had never seen a picture of Hitler in Lt. Adams's office.  She said that she had never seen a television show about Makdessi's crime.

Red Onion Correctional Officer Steven Taylor also testified at the evidentiary hearing. Taylor testified that he was not aware that Makdessi filed a lot of Complaints. He stated that it was very easy for inmates at Red Onion to get forms from the officers. Taylor stated that Makdessi had never asked him for an Informal Complaint form. Taylor stated that he did recall Officer Chandler asking Makdessi to sign the waiver form for Cobler to be placed in the cell with him, which was admitted into evidence as Plaintiff's Exhibit No. 6, (Docket Item No. 92-2.) Taylor denied that anyone told Makdessi that he would be locked up in segregation if he did not sign the form. He said that Makdessi did not tell him that he did not want Cobler placed in the cell with him or that he had ever filed sexual harassment charges against Cobler. He said that he was not aware that Cobler was on Makdessi's enemy list. Taylor stated that Makdessi took the form to his desk and signed it. Taylor testified that he had never heard Lt. Adams, Raiford, Gallihar or White threaten Makdessi. He said that he had never seen a picture of Hitler in Adams's office, and had never heard White or Adams ever say anything about Hitler to Makdessi.

Psychology Associate I Adams also testified at the evidentiary hearing. Adams testified that her office was in the D-1 Building in the protective custody pod. Adams stated that she was not related to Lt. Adams. She testified that no one at Red Onion had ever told her to deny mental health services to Makdessi. Adams stated that her supervisor, T. Huff, had responded to an Inmate Request For Information/Service form that Makdessi had filed on June 3, 2015, alleging that he was being denied mental health services. (Plaintiff's Exhibit No. 5, (Docket Item No. 92-1)).

-51-

Adams testified that she had told Makdessi previously that she could not make any kind of recommendation for him for single-cell assignment and that she told him to speak to a lieutenant or Raiford about it. She said that she had never been involved in a discussion regarding a single-cell assignment. Adams stated that she did recall that Makdessi was evaluated by Dr. McDuffy, and that Dr. McDuffy was treating Makdessi for post-traumatic stress disorder and prescribed Prozac. Adams said that she recognized Dr. McDuffy's signature on Plaintiff's Exhibit No. 19, (Docket Item No. 92-13.)

Mental Health Supervisor Huff also testified at the evidentiary hearing. Huff stated that, according to Makdessi's Red Onion mental health records, Dr. McDuffy saw Makdessi on July 24, 2015. He said that Dr. McDuffy's notes indicated that Makdessi reported suffering from symptoms of chronic post-traumatic stress disorder and that Dr. McDuffy prescribed Prozac for Makdessi. Dr. McDuffy noted that Makdessi was requesting single-cell assignment, but that there was no medical basis to assign him to a single cell. Huff stated that Dr. McDuffy diagnosed Makdessi with post-traumatic stress disorder, possible personality disorder and possible exaggeration to gain single-cell status.

Huff stated that Plaintiff's Exhibit No. 5, (Docket Item No. 92-1), was an Inmate Request For Information/Service form that the Warden's Office had forwarded to him for response. Huff stated that Mental Health did not manage cell assignments; he said the unit managers made those decisions. He said that Mental Health will give an opinion regarding the need for single-cell status, if requested. Huff testified that Mental Health had never recommended that Makdessi be assigned to a single cell. He further stated that he would not recommend Makdessi for single-cell status. Huff stated that he was aware that Makdessi had a prior

shoulder injury and prior back surgery. Huff testified that single-cell status was based on an inmate's ability to care for himself. For instance, he said that he might recommend single-cell status for an inmate who was vulnerable based on a low intelligence.

Red Onion Correctional Officer Jordan Fleming also testified at the evidentiary hearing. Fleming testified that he regularly worked in the B Building at Red Onion, but he was present when inmates from the protective custody unit at River North were received at Red Onion on March 17, 2015. Fleming stated that he remembered Makdessi. Fleming stated that he placed Makdessi's hands behind his back to cuff him upon his arrival at Red Onion. Fleming stated that he did not know Makdessi before that day and that no one had told him to cuff Makdessi to the back. Fleming stated that he cuffed Makdessi to the back because that was the proper intake procedure. He testified that he did not twist Makdessi's arms or squeeze his shoulder. Fleming said that Makdessi did not resist being cuffed in the back. He said he did not force Makdessi's hands to the back and that Makdessi did not yell or scream.

Fleming stated that staff from River North were present that day, and he asked them if Makdessi should be cuffed to the back. He said that he then moved Makdessi's hands from being cuffed in the back to being cuffed in the front. Fleming said that Makdessi was not slammed into the wall. Fleming stated that he did not see Makdessi hit his head when he was cuffed and that Makdessi was not bleeding. He said he did not recall Makdessi's eyeglasses coming off and does not recall picking up Makdessi's glasses.

Lieutenant Horton, an Institutional Investigator at River North, testified that he had investigated a complaint that Makdessi had made against an inmate known as "Peatown," which had mentioned Cobler, when Makdessi was housed at River North. Horton stated that the information he had was that "Peatown," inmate J. Morgan, was bullying other inmates. He said that Morgan was moved out of the pod, and Horton stated that he was never given any information that Makdessi had any problem with Cobler. He stated that he had never destroyed any of Makdessi's Complaints.

Lieutenant Horton testified that he had received Plaintiff's Exhibit No. 7, (Docket Item No. 92-3), from the VDOC Director and had investigated every inmate mentioned in the document. Horton stated that he had determined that the allegations contained in the document were unfounded. Horton stated that, while he investigated the allegations raised by Makdessi in this document, Makdessi was placed in segregation for his protection for a week. Horton stated that "Rabit" was a nickname for Inmate Cobler. Horton stated that his investigation revealed that Morgan was bullying all the inmates in the pod and had not targeted Makdessi or any other inmate.

Correctional Officer S. White testified that he had never threatened Makdessi and had never poisoned his food. He specifically denied ever threatening to plant a weapon on Makdessi. White stated that he did recall that, on one occasion, Makdessi did not stand for count and he told him to stand up. White said that another inmate told him on August 3, 2015, that Makdessi had a weapon. He said he saw something in Makdessi's back pocket, which turned out to be a partially broken inmate razor. White testified that he did not recall Makdessi saying that he had told the court that White was going to plant a weapon on him.

White stated that after he found the razor on Makdessi, he cuffed his hands in front and escorted him to the D-3 Building. White said that Sgt. B. Meade asked Makdessi what he had. White said that Meade did not say, "This is for filing lawsuits."

White stated that he escorted Makdessi to segregation. White stated that he did not squeeze Makdessi's shoulders and that Makdessi did not complain of any shoulder or arm pain. White stated that he did not push Makdessi down when he placed him in the segregation cell. White stated that Makdessi was not injured, did not yell out in pain and that he did not call Makdessi a "cry baby." White stated that two other officers inventoried Makdessi's property. White denied that he urinated on Makdessi's pillow or mattress. White said that he told another officer to get Makdessi a lunch tray, but he admitted that he did not know whether Makdessi ever received lunch that day.

White testified that, during the April shakedown of Makdessi's cell, no contraband was found. White said that Makdessi was strip searched on that day, but he did not make the decision to strip search Makdessi, and he did not participate in this strip search. He specifically denied showing Makdessi any drugs he claims were found in Makdessi's cell.

White testified that he had never threatened Makdessi and that he never told Makdessi that he would set him up. He said that he never told Makdessi to drop any of his lawsuits. White stated that he does not recall ever watching a documentary regarding Makdessi's crime on television or ever saying anything about it to Makdessi. He specifically denied ever making any statement to Makdessi about a big black penis. He stated that he had never yanked Makdessi's

hands through the tray slot on his cell door. He specifically denied ever shutting the cell door tray slot on Makdessi's fingers.

White testified that he had never heard Lt. Adams or Raiford threaten Makdessi. He said that he had never retaliated against Makdessi, nor had he ever witnessed Lt. Adams or Raiford retaliate against Makdessi. White said there had never been a Nazi flag or a picture of Hitler in Lt. Adams's office.

Lieutenant G. Adams testified that he was present at Red Onion on March 17, 2015, when Makdessi arrived there. He denied ever yelling at Makdessi or pointing his finger at him that day. He denied head butting Makdessi. Lieutenant Adams denied making any statement to Makdessi on March 17, 2015, other than, perhaps, explaining the rules of the pod to him. Lieutenant Adams stated that he had never threatened Makdessi and had never heard Raiford threaten Makdessi. Lieutenant Adams specifically denied that he had ever told Makdessi that he would kill him if he filed a Grievance. Lieutenant Adams stated that he knew that Makdessi was on a Common Fare diet, but he said he did not know anything about Makdessi's religious beliefs before he filed this lawsuit. Lieutenant Adams said that he never had a Nazi flag or a picture of Hitler in his office and that he never told Makdessi that his great, great grandfather was Hitler.

Lieutenant Adams stated that he did confiscate Makdessi's eyeglasses on April 13, 2015. He stated that he was notified by Medical that, if an inmate's eyeglasses were not state issued, they were to be confiscated, and the inmate would be placed on a list to be seen by the optometrist. Lieutenant Adams stated that he confiscated eyeglasses from more than 10 inmates on that day, including Makdessi.

Lieutenant Adams stated that a routine shakedown was conducted at Red Onion on April 23, 2015. During the shakedown, he said that a dog alerted on Makdessi's cell. Lieutenant Adams stated that both drug dogs and cellphone dogs were present that day, and he did not remember which one alerted on Makdessi's cell. Lieutenant Adams stated that he ordered that Makdessi be strip searched. Lieutenant Adams admitted that no drugs were found in Makdessi's cell that day.

Lieutenant Adams stated that he never threatened Makdessi in an effort to get him to drop his lawsuits. He denied that he had ever threatened to put a "gangster" cellmate in with Makdessi. Lieutenant Adams specifically denied having any input in the decision to place Cobler in a cell with Makdessi. Lieutenant Adams stated that he had never given Makdessi a Grievance or Complaint form because Makdessi had never asked him for these forms. He denied that he had ever refused to give Makdessi these forms. Lieutenant Adams stated that he had never received any Grievance or Complaint forms from Makdessi. He also specifically denied that he had ever destroyed or thrown away a Grievance or Complaint form from Makdessi. Lieutenant Adams stated that he did not remember ever sending Makdessi back to the pod from the chow hall.

Lieutenant Adams denied that he had ever poisoned Makdessi's food. He denied that he had ever threatened to set Makdessi up with a weapon to get him designated as a level 6 security level. He also denied that he had ever told other inmates in the protective custody pod that Makdessi was the reason the protective custody pod was moved to Red Onion. Lieutenant Adams denied that he had ever called Makdessi a retard, a sand nigger, a big time paper pusher or that he had told Makdessi that the judge would laugh at him. He testified that neither Meade nor White had ever given him a report that he later found to be false. Lieutenant

Adams denied that he told Makdessi, "Heil, Hitler," on April 9, 2015. He also denied that he demanded that Makdessi drop all of his lawsuits on April 18, 2015.

Subsequent to the August hearing, Makdessi has submitted three radiological reports from images taken on October 2, 2015, into evidence. (Docket Item No. 111-1.) These reports are for x-rays taken of Makdessi's left shoulder, lumbosacral spine and right knee. According to the radiologist's reports, the shoulder x-ray showed demineralization with no fracture or dislocation with hypertrophy (overgrowth) about the acromioclavicular joint "which can BE associated with impingement;" the lumbar x-ray showed disc space narrowing at L3-4 and L4-S1; and the knee x-ray showed no effusion or fracture with minimal spurring from the tibia plateau and posterior surface of the patella and a "tiny calcification" adjacent to the anterior tibial tubercle probably representing dystrophic calcification or old injury. None of these reports state what, if any, symptoms should be attributable to the findings, and none of the reports list any opinion as to the causation of any of the findings.

## II. Analysis

Through his various pleadings and amendments, Makdessi seeks injunctive relief ordering the VDOC to transfer him to the protective custody unit at Dillwyn and to grant him indefinite single-cell status. Makdessi also seeks an award of compensatory and punitive damages for violation of his rights under the First, Sixth, Eighth and Fourteenth Amendments based on his allegations of retaliation, assaults and deliberate indifference by various VDOC employees. I, first, will address each of Makdessi's substantive claims, and then I will turn to Makdessi's claims for injunctive relief.

Makdessi seeks compensatory and punitive damages against four VDOC employees at River North – Major Mullin, Sgt. Jones, Unit Manager Doss and Unit Manager McBride – based on claims that he reinjured his back and shoulder on January 8, 2015, when these individuals refused to give him a cart to carry his property from one building to another. It appears that Makdessi claims that this incident violated his rights under the Eighth Amendment prohibition against cruel and unusual punishment, in that these defendants were deliberately indifferent to his medical need for assistance. Makdessi claims that this action also was taken in violation of his right to access the courts under the First Amendment, in retaliation for his filing other lawsuits.

In his verified pleading, (Docket Item No. 12), Makdessi stated that, on January 8, 2015, he told Mullin, Jones, Doss and McBride that he had medical problems that prevented him from carrying his belongings between buildings without reinjuring himself. Makdessi stated that the defendants said "to[o] bad," and they forced him to carry his property, "reinjuring" his back and shoulder. Makdessi claimed that these defendant provided carts for other inmates' use on that day.

Makdessi did not testify regarding this claim at the evidentiary hearings. The only evidence offered at these hearings regarding this claim came from Inmate Witness Nicholas. Nicholas testified that he was present at River North and heard Makdessi ask to use a cart to move his belongings. Nicholas stated that he helped Makdessi carry his belonging that day. In contrast to Makdessi's claims, Nicholas testified that no inmate was provided a cart that day.

Case 7:15-cv-00130-GEC-PMS   Document 120   Filed 12/17/15   Page 59 of 70   Pageid#: 885

The plaintiff in a § 1983 claim has the burden of proof. *See Oliver v. Powell*, 250 F. Supp. 2d 593, 598 (E.D. Va. 2002). Furthermore, no damages may be awarded absent proof of injury. *See Bernadou v. Purnell*, 836 F. Supp. 319, 326 (D. Md. 1993). Since Makdessi has produced no medical evidence that he was prohibited from carrying his belongings and no medical evidence that he suffered any injury on January 8, 2015, I recommend that the court find in favor of the defendants Mullin, Jones, Doss and McBride on these claims. It should be noted that causation evidence is particularly important in a case such as this where the plaintiff argues that he has suffered numerous injuries to his shoulder and back.

I also find numerous reasons why Makdessi cannot prevail on his claim based on the use of excessive force against him upon his arrival at Red Onion on March 17, 2015. Makdessi claims that three unidentified correctional officers, at the direction of defendant Gallihar, "jumped" him as soon as he arrived at Red Onion, forcing his arms to the back to be cuffed and slamming his head into the wall. The only evidence produced in support of this claim is Makdessi's own testimony, which I find incredible based on the evidence produced to the contrary.

While the officer who restrained Makdessi that day, Jordan Fleming, did testify that he cuffed Makdessi's arms to the back, he stated that Makdessi did not scream out in pain or protest in any way. He further testified that Makdessi's arms were cuffed to the back only briefly before a River North employee told him to cuff Makdessi's arms to the front. Fleming stated that he did not know Makdessi before March 17, 2015, and that he had no knowledge that Makdessi's hands should be cuffed in front instead of behind. Fleming specifically denied that he forced Makdessi's arms to the back or that he twisted Makdessi's arms or squeezed

his shoulders. He also specifically denied that Makdessi was slammed into the wall, injuring his head.

Inmate Nicholas, who was transported from River North with Makdessi and present in the hallway when Makdessi claims he was assaulted, testified that he did not see any officers assault Makdessi upon his arrival at Red Onion on March 17, 2015. He said he did not see any correctional officers slam Makdessi's head into the wall, nor did he see any blood on Makdessi's face that day.

Also, Director of Nursing Phipps testified that she personally examined Makdessi upon his intake at Red Onion on March 17, 2015, and she saw no blood on him or any signs of abuse or trauma. Furthermore, Phipps testified that Makdessi voiced no complaints to her of an assault that day or of shoulder pain. Mental Health Supervisor Huff testified that, although Makdessi did tell him he had been assaulted that day, Huff saw no visible injuries, red marks or blood on Makdessi.

Additionally, the court heard testimony from not one, but four inmate witnesses – Cobler, Stewart, Harrison and Wilson, stating that Makdessi previously had offered or given each of them either commissary items or money to offer false testimony or sign false affidavits on his behalf. Defendant Gallihar also specifically denied that he had told anyone to threaten or assault Makdessi at any time. Furthermore, Makdessi, again, has failed to offer any medical evidence that his shoulder, back or head suffered injury on March 17, 2015.

For all these reasons, I recommend that the court find in the defendants' favor on Makdessi's claims based on an alleged assault on March 17, 2015.

I also recommend that the court find in the defendants' favor on Makdessi's claim that he was injured by White's use of excessive force on August 3, 2015.[2] In particular, Makdessi claims that his knees were injured when White pushed him down, "slamming" his knees into the floor that day. Makdessi claims that an unidentified nurse saw him on August 18, while both knees were swollen, and denied him medical treatment. Makdessi later admitted, however, that he saw a doctor for his complaints of knee pain on August 20, 2015. Director of Nursing Phipps testified that Makdessi's medical record shows that he was seen by Jonna Myers, R.N., on August 18 for complaints of hearing loss. According to Phipps, Myers noted that Makdessi complained of knee pain, but Myers noted no swelling in either of Makdessi's knees and that he already was receiving Motrin and Excedrin for complaints of pain. Also, White specifically denied pushing Makdessi down on August 3 when he was placed in the segregation cell. Based on this evidence, I find that Makdessi's version of this event is not credible and that Makdessi has failed to produce any medical evidence that he suffered any injury on this day.

Makdessi's pleadings also contain claims based on alleged acts which he claims were taken in retaliation for his filing of an earlier lawsuit against Gallihar. These alleged acts include placing Cobler in his cell, planting a weapon on Makdessi in order to place him in segregation, poisoning Makdessi's food, refusing to give Makdessi administrative remedies forms or destroying forms he submitted and continuing harassment and threats by Red Onion staff. A prison official's retaliation against an inmate for exercising his First Amendment right of access to

---

[2] Although Officer White is not a defendant in this case, it appears that Makdessi is arguing that one or more of the defendants should be responsible for this alleged use of force because it was done at the defendants' direction in retaliation against Makdessi for filing lawsuits and Complaints.

the courts may be the basis for a § 1983 claim. *See Hudspeth v. Figgins*, 584 F.2d 1345 (4th Cir. 1978) (citing *Bounds v. Smith*, 430 U.S. 817, 823-24 (1977)). In order to prove a retaliation claim, the prisoner must prove that his litigation was the actual motivating factor. *See Huang v. Bd. of Governors*, 902 F.2d 1134, 1140 (4th Cir. 1990); *Dillon v. Murray*, 853 F. Supp. 199, 202 (W.D. Va. 1994). The prisoner also must demonstrate that the retaliatory acts adversely impacted his right to access the court. *See Oliver*, 250 F. Supp.2d at 600. Furthermore, the threat of physical harm to a prisoner if he persists in this pursuit of judicial relief, which places a prisoner in fear for his life, also may establish a claim under § 1983 for cruel and unusual punishment in violation of the Eighth Amendment. *See Hudspeth*, 584 F.2d at 1348. Verbal harassment or abuse by prison officials, in itself, does not state a constitutional deprivation. *See Collins v. Cundy*, 603 F.2d 825, 827 (10th Cir. 1979); *Collins v. Haga*, 373 F. Supp. 923, 925 (W.D. Va. 1974). A threat of harm to a prisoner, if he continues to pursue judicial remedies, with action apparently designed to carry out the threat, however, may state a claim under the Eighth Amendment. *See Hudspeth*, 584 F.2d at 1348.

Again, the only evidence before the court regarding any threats or retaliatory actions taken against Makdessi comes from Makdessi himself, and, based on the weight of the contrary evidence, I find Makdessi's version of these alleged events incredible. In particular, every inmate who testified denied that they had ever heard any of the defendants threaten Makdessi. In fact, Inmate Cobler testified that Makdessi told him that it was he, Makdessi, who was out to get Unit Manager Raiford. Cobler testified that Makdessi told him, "I'm going to get that bitch if it is the last thing I do." Inmate Nicholas testified that he did not recall ever witnessing Officer White harassing Makdessi. He also testified that he had never heard any staff member ever threaten Makdessi. Inmate Stewart testified that he

–63–

had never heard Officer White threaten Makdessi. Inmate Harrison denied that he had ever seen Unit Manager Raiford or Lt. Adams threaten Makdessi. Harrison also testified, "Makdessi lives in a magical world. He is paranoid. Every time Raiford or Lt. Adams comes into the pod he thinks they are out to get him." Inmate Wilson said that he did not even know Makdessi.

Also, every defendant and every Red Onion staff member who testified denied ever witnessing or participating in any harassment, threats or retaliatory acts directed toward Makdessi. Again, Gallihar specifically denied that he had ever told anyone to threaten or harm Makdessi. He stated that he had never retaliated against Makdessi for filing suit against him. Unit Manager Raiford denied each of Makdessi's allegations of threats and harassment against her. Officer Taylor testified that he had never witnessed any of the defendants threaten Makdessi. Officer White testified that he had never threatened or harassed Makdessi. White also testified that he had never witnessed Lt. Adams or Raiford retaliate against Makdessi. White also specifically denied ever poisoning Makdessi's food or planting a razor on him. Lt. Adams also testified that he had never threatened or harassed Makdessi and that he had never heard Raiford threaten Makdessi. Lieutenant Adams also specifically denied that he had ever poisoned Makdessi's food.

It is important to note that Makdessi, himself, has offered contradictory testimony as to at least one alleged retaliatory event – the placement of Inmate Cobler in his cell. At the June 30 hearing, Makdessi conceded that Cobler had been removed from his cell on June 26. Makdessi specifically denied that Cobler had ever assaulted him, physically harmed him or made any threats, sexual or otherwise, toward him while they were cellmates. Makdessi testified that he

-64-

voluntarily gave Cobler commissary items to keep him happy. At the August hearing, however, Makdessi testified that Cobler punched him in the head and ribs and threatened him the very first day he was placed in the cell. He further claimed that Cobler took his commissary items starting that day. Makdessi testified that Cobler physically assaulted him on up to five occasions. He also claimed that Cobler told him that he wanted Makdessi to perform oral sex on him. He further claimed that Cobler told him that they were placed in the cell together to force him to drop his lawsuits and to stop filing Complaints.

Makdessi's credibility is damaged further by his continued assertions in pleadings and his testimony that Cobler "confessed" to sexually harassing him when they were housed at River North. To the contrary, Cobler specifically denied that he had ever sexually harassed Makdessi while they were housed at River North. Cobler admitted that on one occasion he had told another inmate, "Fuck you," in Makdessi's presence. Cobler specifically denied that this comment was directed at Makdessi. Regardless, in the court's experience, the use of this phrase is rarely intended to be either a threat of a sexual attack or a proposition to engage in sexual relations.

Furthermore, Makdessi has failed to offer any evidence that the alleged retaliatory acts adversely impacted his right to access the court. To the contrary, the court's record in this case reflects that Makdessi's access to the court has not been hindered in any way.

For all of these reasons, I recommend that the court enter judgment in favor of the defendants on Makdessi's retaliation claims.

Makdessi's claim for injunctive relief requests that the court order the VDOC to transfer him to the protective custody unit at Dillwyn. Makdessi seeks this relief based on his claims of continuing retaliatory acts and threats directed toward him by Red Onion staff. Because I have found Makdessi's claims incredible, I also recommend that the court deny his request for this injunctive relief.

I also recommend that the court deny Makdessi's request for injunctive relief ordering the VDOC to grant him indefinite single-cell status. Makdessi claims that he should be granted single-cell status because his physical and mental conditions make him vulnerable to attacks, abuse and exploitation at the hands of cellmates. To the contrary, none of the medical or psychological personnel who testified stated that they believed that Makdessi needed single-cell status. Red Onion Director of Nursing Phipps testified that there was nothing in Makdessi's medical records which would justify recommending him for single-cell status. Mental Health Supervisor Huff testified that Makdessi had never suffered from any psychological condition or symptoms warranting single-cell status. Huff stated that no one from Mental Health had ever recommended that Makdessi be placed on single-cell status. He further stated that he would not recommend Makdessi receive single-cell status. It also is important to note that Dr. McDuffy, Makdessi's treating psychiatrist, has noted that it is possible that Makdessi is exaggerating his symptoms in an effort to gain single-cell status.

The court "must accord deference to the officials who run a prison, overseeing and coordinating its many aspects, including security, discipline, and general administration." *Lovelace v. Lee*, 472 F.3d 174, 199 (4th Cir. 2006). In this case, I cannot find that the denial to date of single-cell status to Makdessi is in

violation of any of his constitutional rights. I have no evidence, other than Makdessi's own self-serving statements, that his physical or mental conditions expose him to any continuing risk of injury or attack by his cellmates, which would amount to a violation of his Eighth Amendment right to be free from cruel or unusual punishment. I note that Huff did testify that, based, in large part, on Makdessi's own statements that he felt vulnerable, Makdessi had been designated as at high risk for sexual victimization. Nevertheless, Huff also stated that this designation was made to prevent Makdessi from being placed in a cell with a sexually aggressive inmate.

I also reject Makdessi's claim that he has been denied single-cell status in retaliation for filing lawsuits in violation of his First Amendment rights. Unit Manager Raiford testified that she is the person responsible for deciding if an inmate should receive single-cell status. She stated that she has not granted Makdessi single-cell status because no one from the Medical or Mental Health Departments have told her that his physical or mental conditions warrant single-cell status.

The court notes that the defendants have not argued that any of Makdessi's claims for relief should be barred by his failure to exhaust his administrative remedies as required under the Prison Litigation Reform Act. *See* 42 U.S.C.A. § 1997e(a). Thus, I have not addressed this issue. This may be due to Makdessi's claims that the defendants thwarted his attempts to seek administrative remedies by denying him access to the necessary forms or destroying any such forms that he submitted. Despite Makdessi's testimony that none of the officers at Red Onion would provide him with administrative remedy forms, Makdessi's exhibits in this case show that he had access to the forms. *See* Plaintiff's Exhibit No. 10, (Docket

Item No. 92-6), Plaintiff's Exhibit No. 23, (Docket Item No. 92-17), Plaintiff's Exhibit No. 24, (Docket Item No. 92-18), Plaintiff's Exhibit No. 26, (Docket Item No. 92-20), Plaintiff's Exhibit No. 27, (Docket Item No. 92-21), Plaintiff's Exhibit No. 28, (Docket Item No. 92-22), and Plaintiff's Exhibit No. 29, (Docket Item No. 92-23).

## PROPOSED FINDINGS OF FACTS AND
## CONCLUSIONS OF LAW

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1.  Makdessi has failed to show that he suffered any injury on January 8, 2015, when he was forced to carry his own property between buildings at River North;

2.  Makdessi has failed to persuade the court that any assault or use of excessive force occurred upon his transfer to Red Onion on March 17, 2015;

3.  Makdessi has failed to show that he suffered any injury on March 17, 2015;

4.  Makdessi has failed persuade the court that Officer White used excessive force on him on August 3, 2015;

5.  Makdessi has failed to show that he suffered any injury on August 3, 2015;

6.  Makdessi has failed to persuade the court that any defendant has engaged in any acts in retaliation for his filing of any lawsuit;

7. Makdessi has failed to show that the alleged retaliatory acts adversely impacted his right to access the court;

8. The court should enter judgment in favor of the defendants on Makdessi's claims for compensatory or punitive damages; and

9. The court should deny Makdessi's requests for injunctive relief.

## RECOMMENDED DISPOSITION

Based on the above-stated reasons, I recommend that the court enter judgment in the favor of the defendants on all of Makdessi's claims.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed finding or recommendation to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file written objection to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable Glen E. Conrad, Chief United States District Judge.

The Clerk is directed to send copies of this Report and Recommendation to all counsel of record and unrepresented parties.

DATED: December 17, 2015.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE